James A. Morris, Esq. (SBN 296852)
jmorris@jamlawyers.com
Shane. A. Greenberg, Esq. (SBN 210932)
sgreenberg@jamlawyers.com
JAMES MORRIS LAW FIRM P.C.
4001 W. Alameda Avenue, Suite 202
Burbank, CA 91505
Tel:    (747) 283-1144
Fax:    (747) 283-1143

Daniel J. Orlowsky
ORLOWSKY LAW, LLC
7777 Bonhomme, Suite 1910
St. Louis, Missouri 63105
Phone: (314) 725-5151
Fax;    (314) 455-7375
dan@orlowskylaw.com
(Pro Hac Vice Pending)

Adam M. Goffstein
GOFFSTEIN LAW, LLC
7777 Bonhomme, Suite 1910
St. Louis, Missouri 63105
Phone: (314) 725-5151
Fax:    (314) 455-7278
adam@goffsteinlaw.com
(Pro Hac Vice Pending)

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARGARET PEGGI LOUISE GARVEY on behalf of herself and all others similarly situated,<br><br>              Plaintiff,<br><br>    v.<br><br>THE CAMPBELL'S COMPANY,<br><br>              Defendant. | **CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1

Plaintiff Margaret Peggi Louise Garvey ("Plaintiff" or "Plaintiff Garvey") brings this action on behalf of herself and all others similarly situated against The Campbell's Company (otherwise referred to as "Defendant" or "Campbell's"). Plaintiff makes the following allegations based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

**INTRODUCTION**

1.      This is a class action lawsuit against Defendant for misleading consumers through its marketing and sale of products as safe for use in microwaves.

2.      Defendant labels and markets its microwavable soup products (collectively, the "Campbell's Soup Products" or the "Campbell's Microwavable Soup Products" or the "Products") as "Microwavable," leading reasonable consumers to believe that the Products can be safely heated in microwaves without risk. These representations are false and misleading. In reality, the Products' lids and packaging are made of polypropylene plastic, which scientific studies have shown releases harmful microplastics directly into the soup when microwaved and, as a result, the Products cannot be safely heated in a microwave. Far from being "Microwavable," the Products pose risks precisely in the circumstances Defendant claims are harmless.

3.      By falsely promising that the Products are microwavable and omitting material information about their ability to shed microplastics under ordinary use, Defendant has caused consumers to unknowingly expose themselves and their families to dangerous microplastics through everyday food preparation. These risks are particularly alarming because ingestion of microplastics has been linked to potential cellular penetration and organ damage—harms that no reasonable consumer would expect when using a household soup product labeled as "microwavable."

2

COMPLAINT AND DEMAND FOR JURY TRIAL

4.      Industry forums, government agencies, and consumer safety organizations have warned of the risks of microplastics, and numerous scientific studies confirm that polypropylene packaging—like Defendant's Products—sheds microplastics when heated. Defendant is a major player in the industry employing teams of people for whom product safety and testing should be a chief concern. It is thus well, and uniquely, aware of these risks, but chose to conceal them and affirmatively represent the Products as microwavable to defraud consumers while gaining an unfair competitive advantage over those who do not falsely tout such use as safe. In doing so, Defendant has misled millions of consumers and profited at the expense of their health and welfare, including families seeking convenient, "microwavable" meals for school, work, and travel. The harmful effects of microplastic exposure from polypropylene packaging like Defendant's has resulted in experts advising consumers to avoid them, including microwave use, further underscoring the falsity of Defendant's promise they are "microwavable."

5.      The "Microwavable" representations prominently displayed on the Products' labels convey to consumers that the Products can be safely heated in a microwave. But these claims are false. When microwaved, the Products release harmful microplastics directly into the soup contained inside. Research shows that microwave heating causes the highest microplastic release from plastic packaging made of polypropylene in daily usage scenarios, releasing as many as 4.22 million microplastic and 2.11 billion nanoplastic particles from only one square centimeter of plastic area within just three minutes.

6.      Microwaving a plastic container for just **1 minute** still releases millions of particles as the degradation process begins almost immediately upon heating. Research also shows that the release of microplastics (MPs) from plastic containers follows a rapid upward curve:

COMPLAINT AND DEMAND FOR JURY TRIAL

**10 Seconds**: Microplastic abundance increases to approximately **175,000 MP/L.**

**30 Seconds**: Release jumps to approximately **445,000 MP/L.**

**60 Seconds (1 Minute)**: Abundance reaches approximately **1,070,000 MP/L.**

7.      This 1-minute mark represents a 1,158% increase in plastic particles compared to the same container at room temperature.

8.      While this is lower than the 4.22 million microplastics found after 3 minutes of heating, it demonstrates that even "short bursts" of microwaving are enough to significantly contaminate food. Furthermore, researchers found that multiple short heating cycles are actually worse than one long one; for instance, three 20-second sessions released 132% more plastic than a single 60-second session.

9.      These tiny particles have toxic effects on human health. Studies show they can alter the composition of gut microbiota, which plays a crucial role in proper digestion, nutrient absorption, and immune system development. Microplastics also produce a toxic effect on the digestive tract, causing irreversible changes in the reproductive axis and central nervous system of offspring after prenatal and neonatal exposure, affect the immune system due to their physiochemical properties, and can cause chronic pulmonary disease. Studies have even shown that people with carotid artery plaque in which microplastics were detected had a higher risk of a composite myocardial infarction, stroke, or death from any cause.

10.     Against this backdrop, no reasonable consumer would equate "microwavable," as Defendant promises, with the direct ingestion of unnecessary toxic materials when the Products are used as directed.

11.     While prominently making the affirmative misrepresentations that the Products are "Microwavable," Defendant simultaneously withholds critical information from consumers that is

4

COMPLAINT AND DEMAND FOR JURY TRIAL

directly contrary to those affirmative representations: when the Products are used as intended—heated in a microwave—they leach harmful microplastics directly into the soup, posing serious health risks, including to the human body's core digestive, immune, and reproductive systems. This material omission further misleads reasonable consumers to believe the Products are safe to use as directed, when in truth they are not.

12. Despite being aware of these risks, Defendant provides no warning or disclosure to consumers about the release of toxic microplastics when the Products are used as advertised. By failing to clearly and conspicuously inform consumers of the health dangers associated with the Products—particularly on the packaging and labeling where it affirmatively promises they are "Microwavable"—Defendant has breached its legal duties and misled consumers in violation of consumer protection and other laws.

13. Consumers reasonably expect that products sold in the marketplace are safe for their intended use, especially where, as here, that's what the label affirmatively promises. Consumers further rely on manufacturers to provide clear warnings if a product fails to meet this basic expectation of safety. They expect manufacturers to exercise diligence in ensuring that their products do not expose consumers to harm or, at a minimum, to provide clear warnings when products present significant health risks.

14. These expectations are heightened when the products are intended for food preparation and consumption, practices critical to millions of families nationwide. Defendant exploits these expectations by affirmatively promising the Products are microwavable while concealing the material danger—that its microwavable soup packaging releases harmful microplastics directly into the soup when heated.

COMPLAINT AND DEMAND FOR JURY TRIAL

15.    By labeling the Products as "Microwavable," Defendant misleads consumers into believing they are free of risks associated with microwave heating as directed. Consumers rightfully expect that products designed for microwave use and marketed as "Microwavable" will not leach harmful substances and chemicals directly into their food when used for the purposes advertised. This expectation is reasonable, as consumers rely on such products to be safe when they heat the soup they and their families consume.

16.    Ensuring that microwavable soup products do not expose consumers and their families to harm is a top concern when making purchasing decisions, as is mitigating unnecessary exposure to harmful microplastics. This is especially so in light of mounting evidence further linking microplastics to serious health risks and, as a result, experts advising consumers to avoid them wherever possible to reduce the risk of serious harm.

17.    The Products' representations of being "Microwavable," together with Campbell's Soup's widespread recognition as a leading brand, amplifies consumer trust in the safety of the Products. By leaching harmful microplastics directly into soup when microwaved as advertised and intended for ordinary use, the Products fail to meet consumers' reasonable expectation that they are safe and free from the material danger.

18.    Defendant's deceptive conduct misleads reasonable consumers, including Plaintiff, through both the affirmative "Microwavable" misrepresentations and material omission that they leach harmful microplastics directly into food contained inside, posing serious health risks, including to the human body's core digestive, immune, and reproductive systems. Defendant affirmatively promises that the Products are "Microwavable," leading consumers to believe they can be safely heated. At the same time, Defendant omits material information that the Products release harmful microplastics directly into soup when microwaved as intended and instructed

COMPLAINT AND DEMAND FOR JURY TRIAL

during ordinary use. Both acts of deception mislead consumers into believing the Products are safe, as promised, to use as directed and free from such risks. This deception causes consumers to pay a premium for perceived product quality and promised safety attributes that Defendant fails to deliver. Defendant's affirmative misrepresentations and material omission are therefore both misleading and unlawful.

19.    The Products at issue are Campbell's microwavable soup products sold to consumers in the United States and the state of California, that contain the "Microwavable" representation on their labels and/or packaging, in all sizes, variations, packs, sets, and bundles (collectively referred to herein and throughout this complaint as the "Campbell's Soup Products" or the "Products"). The Products include, but are not necessarily limited to, the following:

- Microwavable Campbell's Baked Potato with Bacon Soup

- Microwavable Campbell's Beef with Country Vegetables Soup Microwaveable Bowl

- Microwavable Campbell's Butternut Squash & Sweet Potato Sipping Soup

- Microwavable Campbell's Chicken and Rice Soup with Oyster Crackers

- Microwavable Campbell's Chicken Noodle Soup

- Microwavable Campbell's Chicken Soup with Star-Shaped Pasta

- Microwavable Campbell's Chili Mac Soup Microwaveable Bowl

- Microwavable Campbell's Chili with Beans Microwaveable Bowl

- Microwavable Campbell's Chicken Noodle Soup Microwaveable Bowl

- Microwavable Campbell's Creamy Broccoli Cheddar Bisque

- Microwavable Campbell's Creamy Chicken & Dumpling Soup Microwaveable Bowl

- Microwavable Campbell's Creamy Tomato Soup

- Microwavable Campbell's Creamy Tomato Soup Microwaveable Bowl

COMPLAINT AND DEMAND FOR JURY TRIAL

- Microwavable Campbell's Creamy Tomato Soup Mini Cups

- Microwavable Campbell's Double Noodle Soup with Goldfish Crackers

- Microwavable Campbell's Homestyle Chicken Noodle Soup Microwaveable Bowl

- Microwavable Campbell's Homestyle Chicken Noodle Soup

- Microwavable Campbell's Hot & Spicy Chili with Beans Microwaveable Bowl

- Microwavable Campbell's Kickin' Crab & Corn Chowder

- Microwavable Campbell's Loaded Potato Seasoned with Bacon Soup Microwaveable Bowl

- Microwavable Campbell's New England Clam Chowder

- Microwavable Campbell's OLD BAY® Seasoned Clam Chowder Microwaveable Bowl

- Microwavable Campbell's Roasted Chicken Noodle Soup with White Meat Chicken

- Microwavable Campbell's Roasted Red Pepper & Smoked Gouda Bisque

- Microwavable Campbell's Sipping Soup, Chicken & Mini Round Noodle Soup

- Microwavable Campbell's Sipping Soup, Classic Tomato Soup

- Microwavable Campbell's Sipping Soup, Creamy Tomato Soup

- Microwavable Campbell's Spicy Tomato Sipping Soup

- Microwavable Campbell's Southwest-Style Chicken Chili

- Microwavable Campbell's Spicy Chicken & Sausage Gumbo Soup Microwaveable Bowl

- Microwavable Campbell's Spicy Chicken Burrito Soup Microwaveable Bowl

- Microwavable Campbell's Spicy Chicken Noodle Soup Microwaveable Bowl

- Microwavable Campbell's Spicy Mexican-Style Chili with Beans Microwaveable Bowl

- Microwavable Campbell's Spicy Tomato Soup Microwaveable Bowl

- Microwavable Campbell's Tomato & Sweet Basil Bisque

- Microwavable Campbell's Tomato Soup with Goldfish Crackers

8

• Microwavable Campbell's White Bean Chicken Chili Microwaveable Bowl

20. Below are fair and accurate depictions of the representative samples of the Products' front labels evidencing the affirmative misrepresentations that the Products are "Microwavable" together with the material omission that the Products carry a substantial risk of releasing microplastics during ordinary use, which is directly contrary to those affirmative representations:

**Microwavable Campbell's Chicken Noodle Soup Microwaveable Bowl**



9

COMPLAINT AND DEMAND FOR JURY TRIAL

**<u>Microwavable Campbell's Sipping Soup, Classic Tomato Soup</u>**



//

//

//

COMPLAINT AND DEMAND FOR JURY TRIAL

**<u>Microwavable Campbell's Homestyle Chicken Noodle Soup Microwaveable Bowl</u>**



//

//

//

COMPLAINT AND DEMAND FOR JURY TRIAL

**Microwavable Campbell's Butternut Squash & Sweet Potato Sipping Soup**



//

//

//

COMPLAINT AND DEMAND FOR JURY TRIAL

21.     Plaintiff brings this action individually and on behalf of similarly situated consumers who purchased the Products during the relevant Class Period, with two primary objectives. Plaintiff's claims arise under state consumer protection statutes and common law duties requiring honesty in commercial transactions. Plaintiff alleges purely economic injuries which occurred at the point of sale. Plaintiff's objectives rest on Defendant's marketing and advertising of the Products, including its labeling misrepresentations and omissions, which fall squarely within this Court's authority. One, Plaintiff seeks on her individual behalf, and on behalf of the Class/Subclass, a monetary recovery for the price premium they have overpaid for Products as a result of Defendant's affirmative "Microwavable" misrepresentations and omission of material information about their ability to shed microplastics under ordinary use as consistent with permissible law (including, for example, damages, restitution, disgorgement, and any applicable penalties/punitive damages solely as to those causes of action so permitted). Two, Plaintiff seeks on her individual behalf, and on behalf of the Class/Subclass, injunctive relief to stop Defendant's unlawful manufacture, marketing, and sale of the Products with the affirmative "Microwavable" misrepresentations and the material omission to avoid or mitigate the risk of deceiving the public into believing that the Products are "Microwavable" as promised and do not pose the material danger that its microwavable soup packaging releases harmful microplastics directly into the soup when heated, by requiring Defendant to change its business practices, which may include one or more of the following: removal or modification to the affirmative "Microwavable" misrepresentations; disclosure of the material omission about their ability to shed microplastics under ordinary use on the Products' labels and/or packaging; disclosure of the material omission about their ability to shed microplastics under ordinary use in the Products' advertising; modification of the Products so that they no longer pose a risk that its microwavable soup

13

packaging releases harmful microplastics directly into the soup when heated; and/or discontinuance of the Products' manufacture, marketing, and/or sale.

22.     Plaintiff and the Class reasonably believed Defendant's false and misleading representations.   Defendant knew or reasonably should have known that its representations regarding the Products were false, deceptive, misleading, and unlawful under California law.

23.     Plaintiff brings claims against Defendant individually and on behalf the Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period") for (1) violation of California's Unfair Competition Law ("UCL"), California Business & Professions Code § 17200, et seq.; (2) violation of California's False Advertising Law ("FAL"), California Business & Professions Code § 17500 et seq.; (3) violation of California's Consumer Legal Remedies Act ("CLRA"), Civil Code § 1750, et. seq.; (4) unjust enrichment; and (5) breach of warranty.

## JURISDICTION

24.     This Court has original jurisdiction over the action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## DIVISIONAL ASSIGNMENT

25.     Pursuant to Civil L.R. 3.2(c) all civil actions that arise in the counties of Alameda, Contra Costa, Marin, Napa, San Francisco, San Mateo, or Sonoma shall be assigned to the San Francisco Division or the Oakland Division.  Plaintiff Margaret Peggi Louise Garvey's residence is

COMPLAINT AND DEMAND FOR JURY TRIAL

in Petaluma, California which is in Sonoma County. Plaintiff Margaret Peggi Louise Garvey prefers to have the case assigned to the San Francisco Division.

**VENUE**

26.    Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District. Specifically, Plaintiff, as detailed below, purchased the unlawful Products in this District, and Defendant has marketed, advertised, and sold the Products within this District.

**PARTIES**

27.    Plaintiff Margaret Peggi Louise Garvey. The following is alleged based upon Plaintiff Garvey's personal knowledge:

a.    Residence: Plaintiff Garvey is a California citizen who resides in Novato, California.

b.    Purchase Details: In June of 2025, Plaintiff Garvey purchased Microwavable Campbell's Chicken Noodle Soup Microwaveable Bowl from Amazon in the State of California for delivery to her Novato, California home.

c.    Reliance: When making her purchase, Plaintiff Garvey read and relied upon Defendant's labeling and packaging representations of the Product as "Microwavable." Here is the labeling and packaging representations that Plaintiff relied on:

//

//

//

15

COMPLAINT AND DEMAND FOR JURY TRIAL



Plaintiff would not have purchased the Product if she had known that it was not microwavable because it cannot be safely heated in a microwave oven and, as a result, the product cannot be safely heated in the circumstances Defendant claims are harmless. The "Microwavable" representation and omission of material information that the Product carries a substantial risk of releasing microplastics when microwaved during ordinary use led her to believe that the Product was safe and capable of being heated in a microwave

16

COMPLAINT AND DEMAND FOR JURY TRIAL

without posing the risk of releasing harmful microplastics directly into the Product when microwaved.

d.      No Actual Knowledge of Falsity: At the time of her purchase, Plaintiff Garvey was unaware that the Product posed the risk of the material danger—i.e., that the Product could leach microplastics when used as is ordinarily expected.

e.      No Notice of Contradictions: Plaintiff Garvey did not observe any disclaimer, qualifier, or other explanatory statement or information on the Product's labels or packaging that disclosed or suggested that the Product leaches microplastics when microwaved as instructed.

f.      Causation/Damages: But for the affirmative "Microwavable" misrepresentations and the material omission—i.e., that the Product carries a substantial risk of releasing microplastics when microwaved during ordinary use—Plaintiff Garvey would not have purchased the Product or would not have paid as much for it.

g.      Desire to Repurchase: Plaintiff Garvey regularly visits stores and websites where Defendant's Products are sold, continues to see the Products available for purchase, and intends to purchase the Products in the future if she can be sure they deliver the advertised benefits and promised product attributes and do not release microplastics during ordinary use and were therefore safe for their central purpose. But absent injunctive relief, Plaintiff Garvey cannot now or in the future rely on the Products' labels because she cannot know whether they remain deceptive, and she may reasonably, but incorrectly, assume the Products were improved or otherwise changed to be safe and deliver the promised product attributes. Plaintiff Garvey is an average consumer who is not sophisticated in the knowledge of plastic composition or in the manufacturing, composition, and formulation of

microwavable soup products, like the Products. An injunction requiring the removal of the affirmative "Microwavable" misrepresentations and the disclosure of the health dangers associated with the Products unless the safety risk was eliminated or otherwise prohibiting the use of a materially false and misleading label would enable Plaintiff Garvey to rely confidently on the labels in making her future purchase decisions. Absent injunctive relief, Plaintiff Garvey and other reasonable consumers would have no way of assessing the safety of the Products based solely on their packaging, which does not disclose that the material releases microplastics upon regular everyday use.

28.     Defendant continues to market and sell the Products with both the affirmative "Microwavable" misrepresentations and the material omission that the Product carries a substantial risk of releasing microplastics when microwaved during ordinary use, creating an ongoing harm to consumers. As an average consumer without specialized knowledge of plastic composition, including the properties of polypropylene used in the packaging of the Products, Plaintiff is particularly vulnerable to this deceptive practice. Despite Plaintiff's desire to purchase the Products again, there is a substantial risk of future injury due to Plaintiff's reasonable but incorrect belief that the Products are safe. Given Defendant's continued marketing of the Products as "Microwavable" without disclosing the health dangers associated with the Products, Plaintiff is likely to believe that the Products' packaging has been reformulated to address this safety issue. This mistaken belief, reinforced by Defendant's ongoing misrepresentations and omissions, would lead Plaintiff to purchase the Products again, exposing her to the same harm she initially experienced. Plaintiff's lack of expertise in plastic composition prevents her from independently verifying whether the Products' packaging has been modified to eliminate the risk of microplastic leaching. As a result, Plaintiff and other reasonable consumers continue to be deprived of the ability to make fully

COMPLAINT AND DEMAND FOR JURY TRIAL

informed purchasing decisions regarding the Products despite their desire to purchase them again. Without injunctive relief, consumers have no way of assessing the Products' safety based on the packaging. The Products do not clearly disclose the material composition of their packaging, and even if they did, consumers would still be unable to determine whether those materials release harmful microplastics when used for the purposes that Defendant promises are safe.

29.    Defendant Campbell Soup Company is a corporation organized under the laws of New Jersey with its principal place of business in Camden, New Jersey. Defendant was doing business in the State of California at all relevant times. Directly and through its agents, Defendant has substantial contacts with and receives substantial benefits and income from and through the State of California. Defendant is the owner, manufacturer, and/or distributor of the Products. Defendant and its agents promoted, marketed, and sold the Products at issue throughout the United States, including the State of California. The unfair, unlawful, deceptive, and misleading affirmative "Microwavable" misrepresentations and material omission on the Products were prepared, authorized, ratified, and/or approved by Defendant and its agents to deceive and mislead consumers in the State of California into purchasing the Products. Additionally, Defendant knew of the falsity of the affirmative "microwavable" misrepresentations and the material omission that the Product carries a substantial risk of releasing microplastics when microwaved during ordinary use, but it failed to correct those misrepresentations or disclose the health dangers associated with the Products at the time Plaintiff and all Class Members purchased the Products, notwithstanding its duty to do so and otherwise comply with consumer protection laws. Further, Defendant had the right and authority, at all relevant times, to not make the affirmative "Microwavable" misrepresentations and/or disclose the material omission that the Product carries a substantial risk of releasing microplastics when microwaved during ordinary use, including the time leading up to

COMPLAINT AND DEMAND FOR JURY TRIAL

and through the incident giving rise to the claims asserted (including Plaintiff's purchases described above, in addition to all Class Members' purchases).

## COMMON FACTUAL ALLEGATIONS

### Microplastics Harm Human Health

30. Microplastics are small plastic particles less than 5 millimeters in diameter that form when solid plastics break down through abrasion, degradation, or chemical processes such as exposure to heat.[1] These tiny particles can have significant adverse effects on human health.[2] Studies show that microplastics alter the composition of gut microbiota, which play a crucial role in digestion, nutrient absorption, and immune system development.[3] Furthermore, microplastics "produce a toxic effect on the digestive tract," that cause irreversible changes in the reproductive axis and central nervous system of offspring after prenatal and neonatal exposure, affect the immune system due to their physicochemical properties, and can cause chronic pulmonary disease.[4]

---

[1] *See* Sumon Sarkar et al., *Microplastic Pollution: Chemical Characterization and Impact on Wildlife*, 20(3) INT. J. ENVIRON. RES. PUBLIC HEALTH 1745 (2023).

[2] *See* Raffaele Marfella et al., *Microplastics and Nanoplastics in Atheromas and Cardiovascular Events*, 390 NEW ENGLAND J. MED. 900 (Mar. 6, 2024), https://www.nejm.org/doi/full/10.1056/NEJMoa2309822 (concluding that "patients with carotid artery plaque in which [microplastics and nanoplastics (MNPs)] were detected had a higher risk of a composite of myocardial infarction, stroke, or death from any cause at 34 months of follow-up than those in whom MNPs were not detected") (last accessed March 10, 2026).

[3] *See* Alba Tamargo et al., *PET Microplastics Affect Human Gut Microbiota Communities During Simulated Gastrointestinal Digestion, First Evidence of Plausible Polymer Biodegradation During Human Digestion*, Nature (Jan. 11, 2022), https://doi.org/10.1038/s41598-021-04489-w ("The work presented here indicates that microplastics are indeed capable of digestive-level health effects.") (last accessed March 10, 2026).

[4] Nur Hanisah Amran et al., *Exposure to Microplastics During Early Developmental Stage: Review of Current Evidence*, MDPI (Oct. 10, 2022)*,* https://pubmed.ncbi.nlm.nih.gov/36287877/ (last accessed March 10, 2026).

COMPLAINT AND DEMAND FOR JURY TRIAL

31.     Even in vitro experiments using human cells and in vivo studies conducted on mice have indicated that microplastics can trigger a range of adverse health effects.[5]  These include inflammation, oxidative stress resulting from increased production of reactive oxygen species, disturbances in lipid metabolism, imbalances in the gut microbiota, and neurotoxicity.[6]  Furthermore, microplastic exposure in laboratory animals has been linked to immunological responses, endocrine disruption, and alterations in energy metabolism.[7]

32.     Microplastics have been found in blood, saliva, liver, kidneys, and even the placenta, which highlights their ability to translocate within the body.[8]  Notably, nanoplastics, the smallest fraction of these pollutants, have been shown to enter cells and even penetrate the cell nucleus, which raises concerns about potential intracellular damage.[9]  Research connects microplastic exposure and serious health issues such as cancer, reproductive problems, lung and liver effects, and disruptions in hormone metabolism.[10]

33.     Given that the Products are intended and advertised to be used by families on an almost daily basis, they pose serious safety risks not only to adult members but also to children.

[5] Yongjin Lee et al., *In Vitro Experiments With Human Gut Microbiota Reveal Changes in Bacterial Composition, Gut Microbiota Dysbiosis, and Neurotoxicity*, National Library of Medicine (May 3, 2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10151227/ (last accessed March 10, 2026).

[6] *Id.*

[7] Junyi Wu et al., *Effects of Endocrine-Disrupting Chemicals on Gut Microbiota and Their Impact on Gut-Related Diseases, Frontiers* (Aug. 12, 2021), https://www.frontiersin.org/articles/10.3389/fendo.2021.724989/full (last accessed March 10, 2026).

[8] Andrew Thurston, *Microplastics Everywhere*, Harvard Medicine: The Magazine of Harvard Medical School, https://magazine.hms.harvard.edu/articles/microplasticseverywhere (last accessed March 10, 2026) .

[9] Joe Myers & Madeleine North, *How Microplastics Get into the Food Chain*, World Economic Forum (Feb. 19, 2025), https://www.weforum.org/stories/2025/02/how-microplastics-get-into-the-foodchain/ (last accessed March 10, 2026).

[10] See Jiaqi Shi et al., The Impact of Microplastic Exposure on Gastrointestinal Tract Cancers: A Comprehensive Review, 16 CANCERS 3703 (2024), https://www.mdpi.com/2072-6694/16/21/3703 (last accessed March 10, 2026).

COMPLAINT AND DEMAND FOR JURY TRIAL

This is especially concerning as scientists studying microplastics have emphasized that microplastics can be especially dangerous to children and that "enacting solid legislative laws and policies to manage the excessive use of plastic products is crucial; otherwise, the health of ecosystems and living organisms will inevitably deteriorate in the coming years. [...] We feel that the government and industries must exert the most significant effort to protect children from MPs [microplastics] exposure. These procedures include avoiding plastic contact of children's meals."[11] Consumers therefore consider exposure to microplastics to be a key purchase driver and seek to avoid the harms associated with ingesting unnecessary microplastics wherever possible.

34.    Yet another study emphasized the serious consequences of microplastic ingestion on cardiovascular systems, finding that subjects with "carotid artery plaque in which microplastics were detected had a higher risk of a composite myocardial infarction, stroke, or death from any cause."[12]

35.    Despite the clear dangers, Defendant not only actively conceals the known risks associated with microplastic exposure, but affirmatively promises the Products are "microwavable" even though such use results in material health danger associated with the Products. In reality, consumers are unknowingly exposing themselves and their families to microplastics, which have been linked to "irreversible changes in the reproductive axis and central nervous system," among other severe health consequences.[13]  Defendant's false advertising thus deprives consumers of the ability to make informed choices about their health and well-being, while also harming them monetarily as the Products do not have the "microwavable" attributes specifically touted by Defendant.

---

[11] Amran et al., *supra* note 4.
[12] Marfella et al., *supra* note 2.
[13] Amran et al., supra note 4.

COMPLAINT AND DEMAND FOR JURY TRIAL

36.    Microplastics are known to bioaccumulate.[14]    Bioaccumulation results in compounding negative health effects, such as growth and reproduction issues, DNA damage due to oxidative stress, inflammation, physical stress, weakened immunity, histological damage, or even death.[15] Microplastics transmit into the human body best through digestion or oral intake.[16] From there, microplastics can leach toxic additives in the acidic environment of the stomach and cause liver inflammation.[17]    For people with inflammatory bowel disease (IBD), the microplastics accumulation in feces is directly related to disease severity.[18]    Those suffering from liver damage also show an 8-fold increase in plastic contamination compared to liver samples from healthy individuals.[19]    This illustrates how microplastics are directly tied to bodily harm and how the greater the amount of microplastics in one's body, the greater the harm. Thus, each instance of exposure to microplastics compounds the potential for long-term harm. For example, the quantity of microplastics in brain samples collected in 2024 was about 50% higher than in brain samples

[14] Yue Li et al., Microplastics in the Human Body: A Comprehensive Review of Exposure, Distribution, Migration Mechanics, and Toxicity, Science Direct (June 22, 2024), https://www.sciencedirect.com/science/article/abs/pii/S0048969724043638 (last accessed March 10, 2026).
[15] Id.
[16] Id.
[17] Dunzhu Li et al., Microplastic Release from the Degradation of Polypropylene Feeding Bottles During Infant Formula Preparation, 1 NATURE FOOD 746, 746 (Oct. 19, 2020), https://doi.org/10.1038/s43016-020-00171-y (last accessed March 10, 2026).
[18] Zehua Yan et al., Analysis of Microplastics in Human Feces Reveals a Correlation between Fecal Microplastics and Inflammatory Bowel Disease Status, 56 ENV'T SCI. & TECH. 414, 414 (Dec. 22, 2021), https://doi.org/10.1021/acs.est.1c03924 (last accessed March 10, 2026).
[19] Thomas Horvatits et al., Microplastics Detected in Cirrhotic Liver Tissue, The Lancet (July 11, 2022), https://www.thelancet.com/pdfs/journals/ebiom/PIIS2352-  3964(22)00328-0.pdf (last accessed March 10, 2026).

23

collected in 2016—demonstrating the alarming reality of bioaccumulation, and another reason why consumers seek to reduce their exposure to microplastics.[20]

37.     A September 2024 study found polypropylene microplastics in bone marrow tested, demonstrating that microplastics like those shed by Defendant's Products embed themselves deeply into the human body.[21]  Another alarming study also published in September 2024 conclusively demonstrated the presence of microplastics in the human brain, with the authors cautioning that their "results should raise concern in the context of increasing prevalence of neurodegenerative diseases."[22]  Ingestion of microplastics has also been linked to colon cancer, which is on the rise in young people, and other cancers related to the gastrointestinal tract.[23]  A recent study published in Nature Medicine on February 3, 2025 revealed a concerning result that brains accumulate 7-30 times greater than the concentrations seen in livers or kidneys, and brain samples from dementia cases exhibited even greater microplastic presence.[24]  What is even more worrying is that liver and brain samples from 2024 had significantly higher concentrations of microplastics than 2016

---

[20] Douglas Main, *Microplastics Are Infiltrating Brain Tissue, Studies Show: 'There's Nowhere Left Untouched,'* The Guardian (Aug. 21, 2024), https://www.theguardian.com/environment/article/2024/aug/21/microplastics-brainpollution-health (last accessed March 10, 2026).

[21] Xiaoli Guo et al., *Discovery and Analysis of Microplastics in Human Bone Marrow*, Science Direct (Sept. 15, 2024), https://doi.org/10.1016/j.jhazmat.2024.135266 (last accessed March 10, 2026).

[22] Luís Fernando Amato-Lourenço et al., *Microplastics in the Olfactory Bulb of the Human Brain*, JAMA Network (Sep. 16, 2024), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2823787 (last accessed March 10, 2026).

[23] Bridget Balch, *Microplastics Are Inside Us All. What Does That Mean for Our Health?*, AAMC (June 27, 2024), https://www.aamc.org/news/microplastics-are-inside-us-all-what-does-mean-our-health (last accessed March 10, 2026).

[24] Alexander J. Nihart et al., *Bioaccumulation of Microplastics in Decedent Human Brains*, Nature Medicine (Feb. 3, 2025), https://www.nature.com/articles/s41591- 024-03453-1 (emphasis added) (last accessed March 10, 2026).

COMPLAINT AND DEMAND FOR JURY TRIAL

samples.[25]  It is no wonder that consumers now report valuing product labels that disclose the risk of microplastics where applicable—and why doctors, specialists, and researchers are recommending consumers do what they can to avoid unnecessary exposure to microplastics.

38.    It is also why Defendant's false advertising is so harmful. The Products are marketed and intended for regular use, purporting to serve as essential tools for heating soup that consumers rely on repeatedly for this purpose because Defendant has falsely promised it is "microwavable." However, with each use as directed, consumers unknowingly ingest unnecessary toxic microplastics that accumulate in their bodies over time due to continuous exposure. This buildup increases the risk of serious health issues, including problems with digestion, immune function, reproductive health, and more.[26]  This ongoing risk makes Defendant's misconduct even more egregious and underscores the urgent need for accountability.

The Products Are Made of Polypropylene Plastic and Are Heated Through Ordinary Use

39.    Defendant intends for consumers to microwave the Products.

40.    The labeling and packaging for the Products claims that they are "Microwavable" leading Plaintiff and other reasonable consumers to understand that regular use of the Products by heating them in microwaves is safe.  This expectation is reinforced by Defendant's own branding and marketing, which explicitly promote the Products with the affirmative "Microwavable" misrepresentations. In fact, Defendant advertises on its official website and packaging that the Products are designed for microwave use because they are "Microwavable." Consumers reasonably rely on these affirmative misrepresentations and expect the Products to be safe for their advertised and intended uses. Yet, they aren't safe for these uses as promised, because Defendant makes the

---

[25] *Id.*
[26] Li et al., *supra* note 14.

COMPLAINT AND DEMAND FOR JURY TRIAL

Products' lids and packaging with polypropylene, a plastic that releases harmful microplastics in significant amounts when subjected to microwave heat.

41.    Research shows that polypropylene products can release microplastics with values as high as 16.2 million particles per liter, and that exposure to high temperatures, such as those encountered during microwaving, significantly increases microplastic release.[27]  In fact, another study found that microwave heating caused the highest release of microplastics and nanoplastics into food compared to other usage scenarios, such as refrigeration or room-temperature storage.[28] It was found that some packaging made with polypropylene could release as many as 4.22 million microplastic and 2.11 billion nanoplastic particles from only one square centimeter of plastic area within 3 minutes of microwave heating.[29]  By advertising and selling the Products, falsely, as "Microwavable" without also disclosing the material risks associated with heating them, Defendant jeopardizes the health and well-being of countless consumers and misleads individuals who trust that these Products are safe to use for these purposes, as Defendant affirmatively represents.

42.    Studies also show that microwaving a plastic container for just **1 minute** still releases millions of particles as the degradation process begins almost immediately upon heating.[30] Research also shows that the release of microplastics (MPs) from plastic containers follows a rapid upward curve:

---

[27] Li et al., *supra* note 17.

[28] Kazi Albab Hussain et al., *Assessing the Release of Microplastics and Nanoplastics from Plastic Containers and Reusable Food Pouches: Implications for Human Health*, ACS Publications (June 21, 2023),  https://pubs.acs.org/doi/10.1021/acs.est.3c01942?ref=PDF (last accessed March 11, 2026).

[29] *Id.*

[30] Liang Xue et al., *Detection of microplastic release into water from plastic containers based on lensless digital holography*, Nanoscale Advances (Volume 7, Issue 23, September 2025), https://www.sciencedirect.com/org/science/article/pii/S251602302500471X (last accessed March 11, 2026).

**10 Seconds**: Microplastic abundance increases to approximately **175,000 MP/L**.

**30 Seconds**: Release jumps to approximately **445,000 MP/L**.

**60 Seconds (1 Minute):** Abundance reaches approximately **1,070,000 MP/L**.[31]

43.    This 1-minute mark represents a 1,158% increase in plastic particles compared to the same container at room temperature.[32]

44.    While this is lower than the 4.22 million microplastics found after 3 minutes of heating, it demonstrates that even "short bursts" of microwaving are enough to significantly contaminate food. Furthermore, researchers found that multiple short heating cycles are actually worse than one long one; for instance, three 20-second sessions released 132% more plastic than a single 60-second session.[33]

45.    Research has also examined how normal use affects microplastic release from food packaging. A scientific study evaluated plastic food packaging under typical use conditions, exposing them to hot water (95°C) or cold water with ice for periods of 1 or 5 hours.[34]   The study concluded that each condition resulted in the release of microplastics, including from packaging made of polypropylene, the same material used in the Products.[35]   A 2025 study examined food packaging made of polypropylene—the same material used in the Products—by filling them with liquid and microwaving to simulate the heating process, and each package released approximately

---

[31] *Id.*
[32] *Id.*
[33] *Id.*

[34] Yet Yin Hee, *The Effect of Storage Conditions and Washing on Microplastic Release from Food and Drink Containers*, 23 FOOD PACKAGING AND SHELF LIFE 100826 (June 2022), https://www.sciencedirect.com/science/article/abs/pii/S2214289422000187?via%3Dihub    (last accessed March 11, 2026).
[35] *Id.*

COMPLAINT AND DEMAND FOR JURY TRIAL

100,000 to 260,000 plastic particles.[36] The cytotoxicity of the microplastics showed a dose-dependent decrease in cell viability.[37]

46. By labeling the Campbell's Soup Products as "Microwavable" without disclosing the material risks of heating them in the microwave, Defendant misled consumers and disregarded their health, knowing they would reasonably use the Products by microwaving them for heating purposes as intended that Defendant falsely promised was safe.

47. Consumers microwave the Products through ordinary use. Consumers routinely use Campbell's Microwavable Soup Products to heat or reheat in the microwave, trusting that Products marketed with affirmative "Microwavable" misrepresentations are genuinely safe for that purpose, as affirmatively promised. However, scientific research shows that heating polypropylene packaging—just like Defendant's Products—at elevated temperatures significantly increases the release of toxic microplastics directly into the soup. As discussed above, heating alone can significantly increase the amount of microplastic released from polypropylene packaging compared to storage at room temperature.[38] Despite knowing these risks, Defendant promotes its Products with affirmative misrepresentations of being microwavable while providing no warnings that using the Products in the ways Defendant promises are safe leads to the direct ingestion of toxic microplastics. As a result, consumers remain unaware of the hidden dangers they face through routine and foreseeable use of the Products. Defendant's misconduct also denies consumers the

---

[36] Yiting Xia et al, *Subcellular Toxicity Assessments of Microplastics Released from Food Containers*, Science Direct (2025), https://www.sciencedirect.com/science/article/abs/pii/S0304389425004534 (last accessed March 11, 2026).
[37] *Id.*
[38] Hussain et al., supra note 28; Xin Guo et al., *Migration Testing of Microplastics from Selected Water and Food Containers by Raman Microscopy*, Science Direct (Jan. 15, 2024), https://www.sciencedirect.com/science/article/abs/pii/S0304389423020824 (last accessed March 11, 2026).

COMPLAINT AND DEMAND FOR JURY TRIAL

opportunity to make different purchase decisions that would not expose them and their families to harmful levels of microplastics that bioaccumulate to even greater danger with each use falsely promised to be "safe."

48.    The Products pose an unreasonable safety hazard. The Products are Campbell's Microwavable Soups with polypropylene plastic lids and packaging, which pose the danger of leaching microplastics when microwaved that can cause serious health risks such as compromising the immune system, damaging the digestive tract, and increasing the risk of various cancers. Here, such danger is exacerbated by the Products' intended and foreseeable use, as Defendant markets the Products with the affirmative "Microwavable" misrepresentations and instructs consumers to microwave them without any warning about the material danger that using the Products in the ways Defendant promises are safe leads to the direct ingestion of toxic microplastics. The material danger is further compounded by the frequent, routine use of these Products in household settings. Many consumers use Campbell's Microwavable Soups almost daily for heating and consuming, thus making exposure to microplastics a recurring and persistent threat. This is particularly concerning given that microplastics bioaccumulate in the body, meaning that each exposure compounds the risk of long-term health harm. As a result, the Products pose an unreasonable safety hazard due to their tendency to leach microplastics directly into soup under normal and intended uses that Defendant falsely promises are safe.

49.    The material danger negates the Products' central function. The central function of Defendant's Campbell's Microwavable Soups is to provide a safe means for heating and consuming soup. However, the Products are defective in fulfilling this function because they release harmful microplastics directly into the soup when used as intended and directed, a defect that directly compromises the Products' ability to perform their intended purpose. Consumers reasonably expect

COMPLAINT AND DEMAND FOR JURY TRIAL

that soup products marketed with the affirmative "Microwavable" misrepresentations can be used safely for microwaving—because that's what the Product labels promise. Reasonable consumers would not equate "microwavable" with exposure to toxic materials. The safety of the Products is material and central to their intended use. Consumers do not purchase microwavable soup products expecting them to expose themselves or their families to health risks such as the material danger of direct ingestion of toxic microplastics. By releasing toxic microplastics directly into soup when microwaved, a use Defendant promises is safe, the Products fail to fulfill their essential function of providing a safe and reliable method for soup heating and consumption. As a result, this material danger renders the Products defective and unsuitable for their intended and advertised purpose.

**The Affirmative Misrepresentations and Material Omission Mislead Reasonable Consumers About the Products' Safety and Conceal the Presence of Harmful Microplastics**

50.    Consumers reasonably expect that the Products are safe to use as directed, particularly when they are explicitly marketed with the affirmative "Microwavable" misrepresentations. These representations create a clear promise that the Products can be used safely for microwaving. Relying on these affirmative claims, consumers trust that microwaving the Products will be safe. In truth, however, and as also affirmatively concealed by Defendant, the Products release harmful microplastics directly into soup when microwaved. The affirmative "Microwavable" misrepresentations and material omission regarding the health dangers associated with the Products are thus not only deceptive, but also dangerous, and therefore, Defendant breaches its promises of safety.[39] Consumers routinely microwave these Products as part of normal

---

[39] Laura López González, I'm a Microplastics Researcher. Here's How To Limit Their Dangers, UCSF (Feb. 27, 2024), https://www.ucsf.edu/news/2024/02/427161/how-to-limit-microplastics-dangers (last accessed March 11, 2026).

COMPLAINT AND DEMAND FOR JURY TRIAL

use, because Defendant promises it is safe to do so, unknowingly exposing themselves and their families to health risks from ingesting contaminated soup. By misrepresenting the Products as "microwavable" and concealing the material danger, Defendant denies consumers the ability to make informed decisions about their health, undermines the very trust its marketing is designed to build, and has duped consumers out of millions of dollars by failing to deliver advertised benefits.

51.    Notably, a recent study tested consumers' willingness to pay for products that disclosed the risk of microplastic contamination versus those that did not; the results revealed that consumers place substantial value on product labels that warn about the potential harm from microplastics.[40]  This is consistent with a key purchase driver for consumers: avoiding unnecessary microplastics in an effort to reduce the risk of serious harm. It also highlights the materiality of Defendant's affirmative "Microwavable" misrepresentations and material omission that the Products carry a substantial risk of releasing microplastics when microwaved during ordinary use and the importance of disclosing the risk of material the health dangers associated with the Products rather than falsely promising the Products are microwavable.[41]

52.    Numerous independent scientific studies have demonstrated that plastic food packaging of the type manufactured by Defendant releases microplastics at measurable levels when exposed to common consumer uses such as microwaving.[42]  These microplastics migrate into food and beverages consumed by users. Consumers reasonably understand "microwavable" to mean that the Products are safe to microwave and will not leach harmful substances under those conditions. In truth, the Products do release microplastics, rendering the affirmative "Microwavable"

---

[40] László Bendegúz Nagy et al., Nudging Consumers About the Issue of Microplastics: An Experimental Auction Study on Valuation for Sustainable Food Packaging, Nature (Aug. 16, 2024), https://www.nature.com/articles/s41598-024- 69962-8 (last accessed March 11, 2026).
[41] *Id.*
[42] Li et al., *supra* note 14; Hussain et al., *supra* note 28; Xue et al., *supra* note 30; Xia et al., *supra* note 36; Guo et al., *supra* note 38.

COMPLAINT AND DEMAND FOR JURY TRIAL

misrepresentations false and misleading. The material danger posed by ingesting microplastics and bioaccumulation have also been confirmed by several scientific studies. Nevertheless, Defendant chooses to continue omitting such danger from the Products' labeling, thereby rendering the material omission false and misleading.

53.     Further, industry forums and consumer safety reports have well documented the migration of microplastics from plastic packaging.[43]   Studies confirming that polypropylene packaging releases microplastics when heated were also available and widely disseminated in the food and packaging industries.[44]   Defendant, as a leading manufacturer, had access to this information, giving it actual and exclusive knowledge of this issue.

54.     Therefore, by affirmatively representing that the Products are "Microwavable," even though they cannot deliver the promised attributes, while also failing to disclose the material dangers associated with the Products, Defendant has intentionally misled consumers about the safety of its Products. This unlawful deception has enabled Defendant to boost its profits at the expense of consumers' trust and their health.

**Plaintiff and Reasonable Consumers Were Misled by the Affirmative Misrepresentations and Material Omission into Buying the Products**

---

[43] Joe Scheuchzer, Consumer Report Finds Plastics Chemicals in Hundreds of Foods and Beverages, Food Packaging Forum (Jan. 16, 2025), https://foodpackagingforum.org/news/consumer-report-finds-plastic-chemicals-in-hundreds-of-foods-and-beverages (quoting PlasticList Report, Plasticlist (Dec. 27, 2024),(last accessed March 11, 2026); Jonathan Stempel, Consumer Reports Finds "widespread" Presence of Plastics in Food, Reuters (Jan. 4, 2024), https://www.reuters.com/business/healthcare-pharmaceuticals/consumer-reports-finds-widespread-presence-plastics-food-2024-01-04/ (quoting Lauren F. Friedman, The Plastic Chemicals Hiding in Your Food, Consumer Reports (Jan. 4, 2024), https://www.consumerreports.org/health/food-contaminants/the-plastic-chemicalshiding-in-your-food-a7358224781/) (last accessed March 11, 2026).

[44] Li et al., *supra* note 14; Hussain et al., *supra* note 28; Xue et al., *supra* note 30; Xia et al., *supra* note 36; Guo et al., *supra* note 38.

55.    Defendant manufactures, markets, promotes, advertises, labels, packages, and sells the Products, each of which represents on the front-label of the Products with the affirmative "Microwavable" misrepresentations, while also omitting the material danger that using the Products in the ways Defendant promises are safe leads to the direct ingestion of toxic microplastics.

56.    On the Products' labeling and packaging, Defendant affirmatively represents that the Products are "Microwavable" to reinforce the false promise that the Products can be heated in a microwave without any risk. At the same time, Defendant omits material information, directly contrary to the affirmative representations, that the Products release dangerous microplastics directly into soup when microwaved during ordinary use.

57.    Defendant's affirmative "Microwavable" misrepresentations, as well as its omission of the material danger, all lead reasonable consumers like Plaintiff to believe that the Products are safe to use as intended and directed. Consumers are led to believe that the Products can be safely used in microwaves and that they do not pose the risk of material danger that using the Products in the ways Defendant promises are safe leads to the direct ingestion of harmful microplastics.

58.    Defendant's affirmative "Microwavable" misrepresentations, as well as its failure to disclose the material danger, are each separately and collectively highly material to reasonable consumers, including Plaintiff, in deciding whether to purchase the Products. When it comes to food preparation and consumption, safety is a paramount concern for consumers, particularly when products are the food they and their families consume. By claiming the Products are microwavable, Defendant created a false impression that they pose no risk when used for this purpose. This deception is especially significant given that microwaving the Products—exactly as Defendant instructs and promises is safe—results in the release of harmful microplastics directly into soup.

33

COMPLAINT AND DEMAND FOR JURY TRIAL

59.     For many consumers, the safety of household items used in the kitchen is a decisive factor in purchasing decisions. Defendant's misleading representations, coupled with its failure to disclose the material danger, deprived consumers of essential information needed to make informed and health-conscious choices. In doing so, Defendant not only misled consumers but also compromised their ability to protect themselves and their families from hidden, avoidable harm.

60.     The Class, including Plaintiff, reasonably relied on the affirmative "Microwavable" misrepresentations in deciding to purchase the Products.

61.     The affirmative "Microwavable" misrepresentations and material omission are false and deceptive because the Products are not safe but instead leach harmful microplastics directly into soup when used for the purposes Defendant promises are safe.

62.     Recent studies have found that polypropylene and similar plastics used in Defendant's Products release tens of thousands of microplastic particles when microwaved.[45] These microplastic and nanoplastic particles are shed into soup, creating a direct ingestion pathway for consumers of Defendant's Products. Ingestion of microplastics leads to endocrine disruption, reproductive harm, gastrointestinal inflammation, and other health issues.[46] Thus, when consumers follow Defendant's usage instructions, they are exposed to levels of microplastics that pose a health risk inconsistent with the representations of being "microwavable," especially given that microplastics bioaccumulate and that the Products are intended for almost daily use.

---

[45] Li et al., *supra* note 14; Hussain et al., *supra* note 28; Xue et al., *supra* note 30; Xia et al., *supra* note 36; Guo et al., *supra* note 38.

[46] Marfella et al., *supra* note 2; Tamargo et al., *supra* note 3; Amran et al., *supra* note 4; Lee et al., *supra* note 5; Wu et al., *supra* note 7; Shi et al., *supra* note 10; Li et al., *supra* note 15; Li et al., supra note 14; Yan et al., *supra* note 18; Horvatits et al., *supra* note 19.

COMPLAINT AND DEMAND FOR JURY TRIAL

63.    Defendant failed to disclose that the Products release microplastics into soup under ordinary use. This omission relates directly to the central function of microwavable soup products—i.e., heating soup safely for consumption—and renders the Products unsafe for their intended use. Consumers would not have purchased the Products, or would have paid significantly less, had they known of this material defect. By choosing to make affirmative representations, Defendant also had a duty to disclose information directly contrary to those representations.

64.    When purchasing the Products, members of the Class, including Plaintiff, were unaware and had no reason to believe the affirmative "Microwavable" misrepresentations and material omission that the Products release harmful microplastics during ordinary use were misleading, deceptive, and unlawful. The Products' labeling and packaging led consumers to believe that the Products were safe for microwave use and free from harm—because that is what the label promises. The Products did not contain any—much less a clear, unambiguous, and conspicuously displayed statement—informing reasonable consumers that the Products posed the risk of the material danger of the direct ingestion of harmful microplastics. Instead, the Products affirmatively promised they were "Microwavable." As a result, consumers were misled into believing the Products were safe for microwave use and free from harm.

65.    Defendant knew, or should have known, that the affirmative "Microwavable" misrepresentations and material omission that the Products release harmful microplastics during ordinary use were misleading, deceptive, and unlawful at the time Defendant manufactured, marketed, advertised, labeled, and sold the Products.

66.    Defendant knew or should have known that the affirmative "Microwavable" misrepresentations and material omission would lead reasonable consumers into believing that the Products would be safe, as promised, for microwaving soup rather than expose them or their

COMPLAINT AND DEMAND FOR JURY TRIAL

families to harmful microplastics. Not only has Defendant utilized a long-standing brand strategy to promote its Products as safe and reliable for common household use, but Defendant also has an obligation under Section 5 of the Federal Trade Commission Act, codified at 15 U.S.C. § 45, to evaluate its marketing claims from the perspective of the reasonable consumer. This statutory obligation required Defendant to consider whether the affirmative "Microwavable" misrepresentations and material omission that the Products release harmful microplastics during ordinary use, whether in isolation or in conjunction with its marketing strategy, would mislead reasonable consumers into believing that the Products are free from the material danger of direct ingestion of toxic microplastics. Thus, Defendant either knew that the affirmative misrepresentations and the material omission were misleading before it marketed the Products to the Class, including Plaintiff, or Defendant would have known that the representations and omission were deceptive had it complied with its statutory obligation to evaluate marketing claims from the reasonable consumer's perspective.

67.    Defendant manufactured and marketed the Products with the affirmative misrepresentations and material omission despite knowing that the Products did not conform to these representations. Specifically, Defendant advertised, labeled, and packaged the Products as "Microwavable," while intentionally failing to inform consumers that the Products release toxic microplastics directly into soup when microwaved. This conduct indicates that Defendant either knew the Products could not perform as advertised, or would have known had it fulfilled its statutory duty to evaluate marketing claims from the reasonable consumer's perspective. Defendant's conscious decision to withhold this critical information reflects an intentional effort to mislead consumers into believing the Products were safer than they actually are.

COMPLAINT AND DEMAND FOR JURY TRIAL

68.     Defendant is in a superior position to Plaintiff and the Class to know about the Products' material danger. As the manufacturer of the Products, Defendant has exclusive knowledge of the dangers associated with microplastic contamination. Defendant's control over the manufacturing, design, distribution, and safety testing of the Products gives it unique insight into the presence of the material danger that using the Products in the ways Defendant promises are safe leads to the direct ingestion of toxic microplastics. Rather than disclosing this information, Defendant purposely made the affirmative "Microwavable" misrepresentations and retained its exclusive knowledge by failing to inform consumers that the Products packaging is made from polypropylene and that polypropylene is known to release microplastics when microwaved. Instead, Defendant actively concealed this risk by prominently labeling the Products with the affirmative misrepresentations to reinforce the false impression that they could be safely microwaved without risk.

69.     Defendant knew or should have known that the affirmative misrepresentations and omission were material to consumers. Manufacturers and marketers, like Defendant, are well aware that product safety is a paramount concern for consumers, particularly for products designed to hold or heat food. Here, the affirmative misrepresentations and omission directly relate to the safety of the Products. Defendant's awareness of this materiality is evident by its decision to prominently label the Products as "Microwavable," which Defendant knew would signal to consumers that the Products were safe for heating soup in a microwave. Furthermore, it is common sense that information about the risk of harmful microplastic contamination would directly influence consumer purchasing decisions. Defendant knew that disclosing the risk of microplastic leaching would likely deter consumers from purchasing the Products and so it unlawfully elected instead to falsely promise they are microwavable.

COMPLAINT AND DEMAND FOR JURY TRIAL

70.    As the manufacturer and marketer of the Products, Defendant had exclusive control over the affirmative "Microwavable" misrepresentations and material omission of the material danger that using the Products in the way Defendant promises is safe leads to the direct ingestion of toxic microplastics on the Products' labels, packaging, and advertisements. Defendant could have easily disclosed the material danger or ceased promising the Products were microwavable. Despite its knowledge and its awareness that consumers reasonably rely on these representations and omissions when making purchasing decisions, Defendant deliberately chose to market the Products with the affirmative misrepresentations while omitting the associated risks. This intentional deception misled consumers into purchasing or overpaying for the Products under the false belief that they were safe for their intended use. Accordingly, Defendant knew or should have known, at all relevant times, that its conduct would mislead reasonable consumers, including Plaintiff, into purchasing the Products based on false and deceptive representations.

71.    Defendant had an obligation, at all relevant times, to disclose the material omission—that the Products leach harmful microplastics directly into soup when microwaved during ordinary use. This critical information, which Defendant deliberately withheld from consumers, is not only material to their purchasing decisions but also poses significant risks to consumer health and well-being. Defendant knew or should have known that reasonable consumers would interpret the affirmative "Microwavable" misrepresentations as meaning the Products would be just that—"microwavable." The absence of any disclosure about the material danger furthered the affirmative deception. Defendant was also fully aware that consumers place a high value on product safety, particularly when it comes to food preparation and consumption, and that this perceived safety was a key factor influencing consumers' purchasing decisions. By affirmatively promising they are microwavable, while also failing to disclose the material danger, Defendant

misled consumers into relying on the affirmative misrepresentations and the material omission when deciding to purchase the Products.

72.    Plaintiff and similarly situated consumers would not have purchased the Products or would not have paid a price premium for them, had they known that the affirmative "Microwavable" misrepresentations were false and the Products posed the material danger that using the Products in the way Defendant promises is safe leads to the direct ingestion of toxic microplastics and, therefore, did not possess the attributes claimed, promised, warranted, advertised, and/or represented. Defendant's affirmative misrepresentations and its material omission misled reasonable consumers into believing the Products were safe for microwaving and consuming soup. As a result, reasonable consumers, including Plaintiff, purchased the Products to their detriment, paying for a product that did not deliver promised attributes while also unknowingly exposing themselves and their families to the material danger.

## CLASS ALLEGATIONS

73.    Plaintiff brings this suit individually and as a class action pursuant to Federal Rule of Civil Procedure Rule 23, on behalf of herself and the following Class of similarly situated individuals:

**Nationwide Class**:  All residents of the United States who, within the applicable statute of limitations periods, purchased the Products for personal, family, or household purposes ("Nationwide Class").

**California Subclass**:  All residents of California who, within four years prior to the filing of this action, purchased the Products for personal, family, or household purposes ("California Subclass").

74. Excluded from the Class are: (i) Defendant, its assigns, successors, and legal representatives; (ii) any entities in which Defendant has controlling interests; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and (iv) any judicial officer presiding over this matter and person within the third degree of consanguinity to such judicial officer.

75. Plaintiff reserves the right to amend or otherwise alter the Class definitions presented to the Court at the appropriate time in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

76. This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

77. Numerosity. Members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the Nationwide Class consists of tens of thousands of purchasers (if not more) dispersed throughout the United States, and the California Subclass likewise consists of thousands of purchasers (if not more) dispersed throughout the state of California. Accordingly, it would be impracticable to join all members of the Class before the Court.

78. Common Questions Predominate: This action involves common questions of law and fact to the potential classes because each Class Member's claim derives from the same deceptive, unlawful and/or unfair statements and omissions. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish

COMPLAINT AND DEMAND FOR JURY TRIAL

the right of each member of the Class to recover. The questions of law and fact common to the Class include, but are not limited to, the following:

a.      Whether Defendant engaged in unlawful, unfair, or deceptive business practices by advertising and selling the Products;

b.      Whether Defendant's conduct of advertising and selling the Products as "Microwavable" while labeling them with the affirmative "Microwavable" misrepresentations and omitting that they leach microplastics during ordinary use constitutes an unfair method of competition, or unfair or deceptive act or practice, in violation of Civil Code section 1750, et seq.;

c.      Whether Defendant used deceptive representations or omission in connection with the sale of the Products in violation of Civil Code section 1750, et seq.;

d.      Whether Defendant represented that the Products have characteristics or quantities that they do not have in violation of Civil Code section 1750, et seq.;

e.      Whether Defendant advertised the Products with intent not to sell them as advertised in violation of Civil Code section 1750, et seq.;

f.      Whether Defendant's labeling and advertising of the Products are misleading in violation of Business and Professions Code section 17500, et seq.;

g.      Whether Defendant knew or by the exercise of reasonable care should have known its labeling and advertising was and is misleading in violation of Business and Professions Code section 17500, et seq.;

h.      Whether Defendant's conduct is an unfair business practice within the meaning of Business and Professions Code section 17200, et seq.;

41

i.      Whether Defendant's conduct is a fraudulent business practice within the meaning of Business and Professions Code section 17200, et seq.;

j.      Whether Defendant's conduct is an unlawful business practice within the meaning of Business and Professions Code section 17200, et seq.;

k.      Whether Plaintiff and the Class paid more money for the Products than they actually received;

l.      How much more money Plaintiff and the Class paid for the Products than they actually received;

m.     Whether Defendant's conduct constitutes breach of warranty;

n.      Whether Plaintiff and the Class are entitled to injunctive relief; and

o.      Whether Defendant was unjustly enriched by its unlawful conduct.

79.     Predominance. The common questions of law and fact predominate over questions that affect only individual Class Members.

80.     Typicality. Plaintiff's claims are typical of the claims of the Class Members she seeks to represent because among other things, all such claims arise out of the same wrongful course of conduct in which the Defendant engaged in violation of law as described herein. Plaintiff, like the Class Members, purchased Defendant's misleading and deceptive Products. In addition, Defendant's unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. Plaintiff's and Class Members' claims arise from the same practices and course of conduct and are based on the same legal theories.

81.     Adequacy. Plaintiff will fairly and adequately protect the interests of all Class Members because it is in her best interests to prosecute the claims alleged herein to obtain full

compensation due to her for the unfair and illegal conduct of which she complains. Plaintiff also has no interests that are in conflict with, or antagonistic to, the interests of Class Members. Plaintiff has retained highly competent and experienced class action attorneys to represent her interests and those of the class. By prevailing on her own claims, Plaintiff will establish Defendant's liability to all Class Members. Plaintiff and her counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the Class Members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class Members.

82. Ascertainability. Class Members can easily be identified by an examination and analysis of the business records regularly maintained by Defendant, among other records within Defendant's possession, custody, or control. Additionally, further Class Member data can be obtained through additional third-party retailers who retain customer records and order histories.

83. Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the classes will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

COMPLAINT AND DEMAND FOR JURY TRIAL

84.    Inconsistent Rulings. Because Plaintiff seeks relief for all members of the Class, the prosecution of separate actions by individual members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant.

85.    Injunctive/Declaratory Relief. The prerequisites to maintaining a class action for injunctive or equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or declaratory relief with respect to the Class as a whole.

86.    Manageability. Plaintiff and her counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## PLAINTIFF'S FIRST CAUSE OF ACTION

### (California Business and Professions Code §§ 17200, et seq.)

### *On Behalf of Herself and the California Subclass*

87.    Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

88.    California Cal. Bus. & Prof. Code § 17200 (the "UCL") prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

89.    Defendant, in its advertising and packaging of the Products, made misleading statements and fraudulent omissions regarding the quality and characteristics of the Products—specifically, the affirmative "Microwavable" misrepresentations and material omission—despite the fact that the Products are not microwavable because they leach microplastics when used as

44

COMPLAINT AND DEMAND FOR JURY TRIAL

intended. Such claims and omission appear on the label and packaging of the Products, which are sold at retail stores and on-line via e-commerce websites and point-of-purchase displays, as well as Defendant's official website, and other retailers' advertisements that have adopted Defendant's advertisements.

90.    Plaintiff has no adequate remedy at law for the injuries currently being suffered as an award of monetary damages would not prohibit Defendant's unlawful marketing, advertising, sale, and distribution of the Products in California.  If an injunction is not granted, Plaintiff will suffer irreparable injury because she continues to desire to purchase Products from Defendant in the future that are "Microwavable" but is unable to determine with confidence whether the Products are "Microwavable."  Thus, Plaintiff and the Class seek an order enjoining Defendant's acts of unlawful, unfair, and deceptive acts and practices in California, which serves the public interest by protecting the public's health and by preventing Defendant from gaining an unfair advantage over companies that lawfully sell their products as "Microwavable" that do that do not have the material danger that using the Products in the way Defendant promises is safe leads to the direct ingestion of toxic microplastics.  In addition, Plaintiff and the Class seek restitution to the individual victims of Defendant's unlawful, unfair, and deceptive practices.

91.    Defendant engaged in a deliberately fraudulent marketing scheme. Defendant does not have any reasonable basis for the claims about the Products made in Defendant.  Defendant does not have any reasonable basis for the claims about the Products made in Defendant's advertising and on Defendant's packaging or labeling because the Products are not "Microwavable." Defendant knew and knows that the Products are not free from plastic exposure because they leach microplastics into the soup in ordinary use, though Defendant intentionally

COMPLAINT AND DEMAND FOR JURY TRIAL

advertised and marketed the Products to deceive reasonable consumers into believing that the Products are microwavable.

92.     Defendant has exclusive knowledge of the Products' danger of leaching microplastics. As the manufacturer of the Products, Defendant is in a superior position to consumers, including Plaintiff, to know about the risks associated with microplastic contamination. Defendant's control over the manufacturing, design, distribution, and safety testing of the Products gives it unique and exclusive knowledge of the presence of the material danger. This superior knowledge places Defendant in a position of responsibility to disclose the risk of microplastic exposure, yet Defendant deliberately withheld this critical information while marketing the Products with the affirmative "Microwavable" representations.

93.     These misleading advertising claims cause purchase of the Products. Defendant's labeling and advertising of the Products led to, and continues to lead to, reasonable consumers, including Plaintiff, believing that the Products are a safe heating solution.

94.     Plaintiff and the California Subclass have suffered injury in fact and have lost money or property as a result of and in reliance upon the material omission that the Products are not microwavable because they leach microplastics when used as intended—namely, Plaintiff and the California Subclass lost the purchase price for the Products they bought from Defendant.

95.     Defendant's conduct, as alleged herein, constitutes unfair, unlawful, and fraudulent business practices pursuant to the UCL. The UCL prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising." Cal. Bus & Prof. Code § 17200. In addition, Defendant's use of various forms of advertising media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented in any

COMPLAINT AND DEMAND FOR JURY TRIAL

manner constitutes unfair competition, unfair, deceptive, untrue or misleading advertising, and an unlawful business practice within the meaning of Business and Professions Code Sections 17200 and 17531, which advertisements have deceived and are likely to deceive the consuming public, in violation of Business and Professions Code Section 17200.

96. Defendant failed to avail itself of reasonably available, lawful alternatives to further its legitimate business interests.

97. All of the conduct alleged herein occurred and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern, practice and/or generalized course of conduct, which will continue on a daily basis until Defendant voluntarily alters its conduct or Defendant is otherwise ordered to do so.

98. Pursuant to Business and Professions Code Sections 17203 and 17535, Plaintiff and the members of the California Subclass seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of labeling and advertising the sale and use of the Products. Likewise, Plaintiff and the members of the California Subclass seek an order requiring Defendant to disclose such misrepresentations, and to preclude Defendant's failure to disclose the existence and significance of said misrepresentations.

99. Plaintiff also seeks equitable relief, including restitution, with respect to her UCL fraudulent acts and practices claims. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiff makes the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in her causes of action for violation of California's Consumer Legal Remedies Act ("CLRA"), Civil Code § 1750, et. seq. and California's False Advertising Law ("FAL"), California Business & Professions Code § 17500 et seq.;, in the event that such causes of action will not succeed. Plaintiff and the Class may be unable to obtain monetary, declaratory and/or

injunctive relief directly under her causes of action for violation of the CLRA and FAL and will lack an adequate remedy of law, if the Court requires her to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the UCL, because Plaintiff may not be able to establish each Class member's individualized understanding of Defendants' misleading representations as described in this Complaint, but the UCL does not require individualized proof of deception or injury by absent class members.  See, e.g., Stearns v Ticketmaster,655 F.3d 1013, 1020, 1023-25 (9th Cir. 2011) (distinguishing, for purposes of CLRA claim, among class members for whom website representations may have been materially deficient, but requiring certification of UCL claim for entire class).  In addition, Plaintiff and the Class may be unable to obtain such relief under her cause of action for violation of the CLRA and FAL and will lack an adequate remedy at law, if Plaintiff is unable to demonstrate the requisite mens rea (intent, reckless, negligence, accrual or constructive knowledge of the falsity), because the UCL imposes no such mens rea requirement and liability exists even if Defendants acted in good faith.

100.    As a direct and proximate result of Defendant's misconduct in violation of the UCL, Plaintiff and members of the California Subclass were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiff and members of the California Subclass have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for violation of the UCL in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the California Subclass for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

"Unfair" Prong

COMPLAINT AND DEMAND FOR JURY TRIAL

101.   Under the UCL, a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid." Camacho v. Auto Club of Southern California, 142 Cal. App. 4th 1394, 1403 (2006).

102.   Defendant's action of mislabeling the Products with the affirmative "Microwavable" misrepresentations and material omission that the Products leach microplastics when used as intended does not confer any benefit to consumers; rather, doing so causes injuries to consumers, who do not receive products commensurate with their reasonable expectations, overpay for the Products, receive Products of lesser standards than what they reasonably expected to receive, and are exposed to increased health risks. Consumers cannot avoid any of the injuries caused by Defendant's deceptive labeling and advertising of the Products. Accordingly, the injuries caused by Defendant's deceptive labeling and advertising outweigh any benefits.

103.   Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under California Business and Professions Code Section 17200. They "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." Davis v. HSBC Bank Nevada, N.A., 691 F.3d 1152, 1169 (9th Cir. 2012).

104.   Here, Defendant's conduct of labeling the Products with the affirmative "Microwavable" misrepresentations while omitting the material danger associated with ordinary use of the Products has no legitimate utility and financially harms consumers. Any potential utility from Defendant's conduct is vastly outweighed by the gravity of the harm caused to consumers, who are unknowingly exposed to microplastic contamination and unjustly pay a premium for Products that fail to meet their reasonable expectations of safety.

COMPLAINT AND DEMAND FOR JURY TRIAL

105.    Some courts require that "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition." Lozano v. AT&T Wireless Servs. Inc., 504 F.3d 718, 735 (9th Cir. 2007),

106.    Defendant's labeling and advertising of the Products, as alleged herein, is deceptive, misleading, and unreasonable, and constitutes unfair conduct. Defendant knew or should have known of its unfair conduct. Defendant's affirmative "Microwavable" misrepresentations and material omission constitutes an unfair business practice within the meaning of California Business and Professions Code Section 17200.

107.    Reasonably available alternatives existed that would have allowed Defendant to further its legitimate business interests without engaging in the deceptive conduct described herein. Defendant could have refrained from labeling the Products with the affirmative "Microwavable" misrepresentations without disclosing the risk of microplastic contamination. Alternatively, Defendant could have provided clear warnings on the Products' labels to inform consumers of the potential dangers associated with microwaving the Products as intended. These reasonable alternatives would have allowed Defendant to market its Products truthfully while protecting consumers from the undisclosed risks of microplastic exposure.

108.    All of the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

109.    Pursuant to Business and Professions Code Section 17203, Plaintiff and the California Subclass seek an order from this Court enjoining Defendant from continuing its practice of labeling the Products with the affirmative "Microwavable" misrepresentations without disclosing the risk of microplastic contamination. Plaintiff and the California Subclass request that

COMPLAINT AND DEMAND FOR JURY TRIAL

the Court prohibit Defendant from engaging in these deceptive practices to prevent further harm to consumers.

110.    Plaintiff and the California Subclass have suffered injury in fact, have lost money, and were exposed to increased health risks as a result of Defendant's unfair conduct. Plaintiff and the California Subclass paid an unwarranted premium for the Products, believing they were safe and free from harmful plastic exposure. Specifically, Plaintiff and the California Subclass paid for Products they reasonably believed did not pose the risk of microplastic contamination. Had they known the truth, Plaintiff and the California Subclass would not have purchased the Products or would have paid substantially less for them. Accordingly, Plaintiff and the California Subclass seek damages, restitution, and/or disgorgement of ill-gotten gains pursuant to the UCL.

## **"Fraudulent" Prong**

111.    The UCL considers conduct fraudulent (and prohibits said conduct) if it is likely to deceive members of the public. Bank of the West v. Superior Court, 2 Cal. 4th 1254, 1267 (1992).

112.    Defendant employed the affirmative "Microwavable" misrepresentations and material omission that the Products are not microwavable because they leach microplastics when used as intended with the intent to sell the Products to consumers, including Plaintiff and the California Subclass. The affirmative misrepresentations and material omission are deceptive, and Defendant knew or should have known of their deceptive nature. By affirmatively representing the Products with the affirmative "Microwavable" misrepresentations while omitting the risk that the Products release harmful microplastics when microwaved, Defendant misleads consumers into believing the Products are safe for their intended use. Both the affirmative misrepresentations and material omission are likely to mislead reasonable consumers, as they pertain to a critical safety

COMPLAINT AND DEMAND FOR JURY TRIAL

concern that is material to the purchasing decisions of the average, ordinary, and reasonable consumer.

113.    As alleged herein, the misrepresentations by Defendant constitute a fraudulent business practice in violation of California Business & Professions Code Section 17200.

114.    Plaintiff and the California Subclass reasonably and detrimentally relied on the affirmative misrepresentations and the material omission to their detriment in that they purchased the Products.

115.    Defendant had reasonably available alternatives to further its legitimate business interests, other than the conduct described herein. Defendant could have refrained from labeling the Products with the affirmative "Microwavable" misrepresentations and material omission that the Products are not microwavable because they leach microplastics when used as intended. Alternatively, Defendant could have provided clear warnings on the Products' labels to inform consumers of the potential dangers associated with microwaving the Products as intended.

116.    All of the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct.

117.    Pursuant to Business and Professions Code Section 17203, Plaintiff and the California Subclass seek an order from this Court enjoining Defendant from continuing its practice of labeling the Products with the affirmative "Microwavable" misrepresentations without disclosing the risk of microplastic contamination. Plaintiff and the California Subclass further seek an order requiring Defendant to cease its deceptive conduct and to provide clear and conspicuous warnings about the risk of microplastic exposure when the Products are microwaved as intended.

118.    Plaintiff and the California Subclass have suffered injury in fact and have lost money as a result of Defendant's fraudulent conduct. Plaintiff paid an unwarranted premium for the

Products. Specifically, Plaintiff and the California Subclass paid for Products they reasonably believed did not pose the risk of microplastic contamination. Had they known the truth, Plaintiff and the California Subclass would not have purchased the Products or would have paid substantially less for them. Accordingly, Plaintiff and the California Subclass seek damages, restitution, and/or disgorgement of ill-gotten gains pursuant to the UCL.

### "Unlawful" Prong

119.   The UCL identifies violations of other laws as "unlawful practices that the unfair competition law makes independently actionable." Velazquez v. GMAC Mortg. Corp., 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

120.   Defendant's labeling of the Products, as alleged herein, violates California Civil Code sections 1750, et seq. (the "CLRA") and California Business and Professions Code sections 17500, et seq. (the "FAL") as set forth below in the sections regarding those causes of action.

121.   Additionally, Defendant's use of the material omission to sell the Products violates California Civil Code sections 1572 (actual fraud), 1573 (constructive fraud), 1709-1710 (fraudulent deceit), and 1711 (deceit upon the public), as set forth above.

122.   Defendant's conduct in making the false representations and deceptive omission described herein constitutes a knowing failure to adopt policies in accordance with and/or adherence to applicable laws, as set forth herein, all of which are binding upon and burdensome to its competitors. This conduct engenders an unfair competitive advantage for Defendant, thereby constituting an unfair, fraudulent and/or unlawful business practice under California Business & Professions Code sections 17200-17208. Additionally, Defendant's omission of material facts, as set forth herein, violates California Civil Code sections 1572, 1573, 1709, 1710, 1711, and 1770, as well as the common law.

COMPLAINT AND DEMAND FOR JURY TRIAL

123. Defendant's packaging, labeling, and advertising of the Products, as alleged herein, are deceptive, misleading, and unreasonable, and constitute unlawful conduct. Defendant knew or should have known of its unlawful conduct.

124. Defendant had reasonably available alternatives to further its legitimate business interests, other than the conduct described herein. Defendant could have refrained from labeling the Products with affirmative "Microwavable" misrepresentations without disclosing the risk of microplastic contamination. Alternatively, Defendant could have provided clear warnings on the Products' labels to inform consumers of the potential dangers associated with microwaving the Products as intended.

125. All of the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct.

126. Pursuant to Business and Professions Code Section 17203, Plaintiff and the California Subclass seek an order from this Court enjoining Defendant from continuing its practice of labeling the Products with the affirmative "Microwavable" misrepresentations without disclosing the risk of microplastic contamination. Plaintiff and the California Subclass further seek an order requiring Defendant to cease its deceptive conduct and to provide clear and conspicuous warnings about the risk of microplastic exposure when the Products are microwaved as intended.

127. Plaintiff and the California Subclass have suffered injury in fact and have lost money as a result of Defendant's unlawful conduct. Plaintiff and the California Subclass paid an unwarranted premium for the Products. Plaintiff and the California Subclass would not have purchased the Products if they had known that Defendant purposely deceived consumers into believing that the Products are free from harmful plastic exposure. Accordingly, Plaintiff seeks damages, restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

COMPLAINT AND DEMAND FOR JURY TRIAL

**PLAINTIFF'S SECOND CAUSE OF ACTION**

**(False Advertising, Business and Professions Code § 17500, et seq. ("FAL")**

***On Behalf of Herself and the California Subclass***

128.    Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

129.    The False Advertising Law, codified at Cal. Bus. & Prof. Code section 17500, et seq., prohibits "unfair, deceptive, untrue or misleading advertising[.]"

130.    Defendant violated Section 17500 when it advertised and marketed the Products through the unfair, deceptive, and misleading affirmative "Microwavable" misrepresentations and material omission that the Products are not microwavable because they leach microplastics when used as intended disseminated to the public via the Products' labeling, packaging, and advertising. The affirmative misrepresentations and material omission were deceptive because the Products do not conform to the representations made about their safety, including the affirmative "Microwavable" claim. The affirmative misrepresentations and material omission were material because they are likely to, and did, mislead reasonable consumers into purchasing the Products under the false belief that they were safe for their intended use and free from the risk of microplastic contamination.

131.    In making and disseminating the affirmative misrepresentations and the material omission, Defendant knew or should have known that the affirmative misrepresentations and the material omission were untrue or misleading and thereby acted in violation of California Business and Professions Code § 17500. Defendant's affirmative representation that the Products are "Microwavable" combined with its failure to disclose the risk of microplastic contamination, constituted a deceptive practice that Defendant knew, or should have known, was false and likely to mislead reasonable consumers.

132.    Defendant has exclusive knowledge of the Products' danger of leaching microplastics. As the manufacturer of the Products, Defendant is in a superior position to consumers, including Plaintiff, to know about the risks associated with microplastic contamination. Defendant's control over the manufacturing, design, distribution, and safety testing of the Products provides it with exclusive knowledge of the presence of the material dangers associated with the Products. This superior knowledge placed Defendant in a position of responsibility to disclose the risk of microplastic exposure, yet Defendant deliberately withheld this critical information while affirmatively marketing the Products with the Affirmative Representations.

133.    Defendant's affirmative misrepresentations and material omission were specifically designed to induce reasonable consumers, like Plaintiff and the California Subclass, to purchase the Products.

134.    As a direct and proximate result of Defendant's misconduct in violation of the FAL, Plaintiff and members of the California Subclass were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for violation of the FAL in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the California Subclass for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

//

//

//

COMPLAINT AND DEMAND FOR JURY TRIAL

## PLAINTIFF'S THIRD CAUSE OF ACTION

**(Violation of the Consumer Legal Remedies Act, California Civil Code § 1750, et seq.)**

***On Behalf of Herself and the California Subclass***

135.    Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

136.    The CLRA provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

137.    The Products are "goods," as defined by the CLRA in California Civil Code § 1761(a).

138.    Defendant is a "person," as defined by the CLRA in California Civil Code § 1761(c).

139.    Plaintiff and members of the California Subclass are "consumers," as defined by the CLRA in California Civil Code § 1761(d).

140.    The purchase of the Products by Plaintiff and members of the California Subclass are "transactions" as defined by the CLRA under California Civil Code § 1761(e).

141.    Defendant violated the following sections of the CLRA by selling the Products to Plaintiff and the California Subclass through the misleading, deceptive, and the fraudulent affirmative misrepresentations and material omission.

a.    Section 1770(a)(5) by representing that the Products have "characteristics, ... uses [or] benefits ... which [they] do not have."

b.    Section 1770(a)(7) by representing that the Products "are of a particular standard, quality, or grade ... [when] they are of another."

57

COMPLAINT AND DEMAND FOR JURY TRIAL

c.    Section 1770(a)(9) by advertising the Products "with [the] intent not to sell them as advertised."

142.    Defendant's uniform affirmative "Microwavable" misrepresentations and material omission of the material danger that using the Products in the way Defendant promises is safe leads to the direct ingestion of toxic microplastics was likely to deceive, and Defendant knew or should have known that its omission and misrepresentations were misleading.

143.    Defendant's uniform affirmative "Microwavable" misrepresentations and material omission of the material danger regarding the Products was likely to deceive reasonable consumers. Defendant knew or should have known that its affirmative misrepresentations and material omission of the material danger was misleading and deceptive. By failing to disclose this critical safety risk, Defendant misled consumers into believing the Products were safe for their intended use.

144.    Defendant's conduct is malicious, fraudulent, and wanton in that Defendant intentionally misled and withheld material information from consumers, including Plaintiff, to increase the sale of the Products.

145.    Plaintiff and members of the California Subclass could not have reasonably avoided such injury. Plaintiff and members of the California Subclass were misled and unaware of the existence of facts that Defendant suppressed and failed to disclose, and Plaintiff and members of the California Subclass would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

146.    Plaintiff and the California Subclass suffered harm as a result of Defendant's violations of the CLRA because they relied on the affirmative "Microwavable" misrepresentations and material omission in deciding to purchase the Products. The affirmative misrepresentations and

COMPLAINT AND DEMAND FOR JURY TRIAL

material omission were together a substantial factor. The affirmative misrepresentations and material omission were material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

147.    CLRA Section 1782 NOTICE.  Pursuant to California Civil Code, Section 1782, on September 25, 2025, Plaintiff's counsel, acting on behalf of all members of the Class, prior to the filing of this Complaint Plaintiff provided Defendant with notice and demand that within thirty (30) days from that date, Defendant correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein.  The letter formally notified Defendant of the violations of Section 1770 set forth herein and demanded that Defendant take corrective action to remedy the issues resulting from the conduct described herein, as well as provide notice of its intent to do so to all affected consumers. Defendant failed to take any of the requested actions within thirty days.

148.    Plaintiff seeks, pursuant to California Civil Code § 1780(a), on behalf of herself and those similarly situated members of the Class, actual damages, punitive damages and restitution of any ill-gotten gains due to Defendant's acts and practices. With regard to the amount of damages and restitution, Plaintiff seeks to recover for herself and the Class a full refund of the price paid for the Products, or in the alternative, the price premium paid for the Products, i.e., difference between the price consumers paid for the Products and the price that they would have paid but for Defendant's misrepresentations and omission.

149.    Plaintiff also requests that this Court award them costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

//

//

## PLAINTIFF'S FOURTH CAUSE OF ACTION

### (Unjust Enrichment)

*On Behalf of Herself and the Nationwide Class and, in the alternative, the California Subclass*

150.    Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

151.    Plaintiff and the Class have no adequate remedy at law for the injuries currently being suffered as an award of monetary damages would not prohibit Defendant's unlawful marketing and labeling of the Products with Defendant's uniform affirmative "Microwavable" misrepresentations and material omission of the material danger that using the Products in the way Defendant promises is safe leads to the direct ingestion of toxic microplastics.  Without equitable relief, Defendant's unlawful, unfair, and deceptive practices will continue to harm Plaintiff and the Class.

152.    At all times relevant hereto, Defendant deceptively marketed, advertised, and sold merchandise to Plaintiffs and the Classes.

153.    Plaintiff and the Class members conferred benefits on Defendant by purchasing the Products.

154.    Plaintiffs and members of the Classes conferred upon Defendant non-gratuitous payments for the Products that they would not have if not for Defendant's deceptive advertising and marketing.  Defendant accepted or retained the non-gratuitous benefits conferred by Plaintiffs and members of the Classes, with full knowledge and awareness that, as a result of Defendant's deception, Plaintiffs and members of the Class were not receiving a product of the quality, nature, fitness, or value that had been represented by Defendant and reasonable consumers would have expected.

COMPLAINT AND DEMAND FOR JURY TRIAL

155.    Defendant voluntarily accepted and retained the benefits conferred.

156.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and the Class members' purchases of the Products.

157.    Retention of that money under these circumstances is unjust and inequitable because Defendant falsely and misleadingly represented through its labeling, advertising and marketing materials that the Products are microwavable, when the Products are not in fact microwavable.

158.    These misrepresentations and omissions caused injuries to Plaintiff and the Class members because they would not have purchased the Products, or would not have paid as much for the Products, had they known that the Products are not microwavable.

159.    Because Defendant's retention of the non-gratuitous benefits conferred to it by Plaintiff and the Class members is unjust and inequitable, Defendant ought to pay restitution to Plaintiff and the Class members for its unjust enrichment.

160.    As a direct and proximate result of Defendant's unjust enrichment, Plaintiff and the Class members are entitled to restitution or disgorgement in an amount to be proved at trial.

**PLAINTIFF'S FIFTH CAUSE OF ACTION**

**(Breach of Warranty)**

***On Behalf of Herself and the Nationwide Class and, in the alternative, the California Subclass***

161.    Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

162.    By advertising and selling the Products at issue, Defendant made promises and affirmations of fact on the Products' packaging, labeling, and through its marketing and advertising, as described herein. This labeling and advertising constitute express warranties that became part of the basis of the bargain between Plaintiff, members of the Class, and Defendant.

COMPLAINT AND DEMAND FOR JURY TRIAL

Through the Products' labeling and advertising, including the affirmative representations—"Microwavable" claim, Defendant expressly warranted that the Products were safe for heating and freezing. Defendant's material omission of the risk that the Products release harmful microplastics when heated is inconsistent with this express warranty. As a result, Defendant's representations misled consumers into believing the Products were safe for their intended use, when in fact they posed a risk of microplastic contamination.

163.    By advertising and selling the Products at issue, Defendant, as a merchant of goods, made promises and affirmations of fact that the Products are merchantable and conform to the promises and affirmations of fact made on the Products' packaging, labeling, and through its marketing and advertising, as described herein. This labeling and advertising, combined with the implied warranty of merchantability, constitute warranties that became part of the basis of the bargain between Plaintiffs, members of the Class, and Defendant. Specifically, Defendant's affirmative misrepresentations that the Products are "Microwavable" coupled with its material omission of the risk that the Products release harmful microplastics when heated falsely conveyed that the Products were safe for their intended use. Defendant's failure to disclose this material risk violated the implied warranty of merchantability and misled consumers into believing the Products conformed to their reasonable expectations of safety and quality.

164.    Contrary to Defendant's warranties, the Products do not conform to the affirmative "Microwavable" representations. Therefore, Defendant breached its warranties about the Products and their qualities.

165.    Defendant has exclusive knowledge of the Products' danger of leaching microplastics. As the manufacturer of the Products, Defendant is in a superior position to consumers, including Plaintiffs, to know about the risks associated with microplastic

COMPLAINT AND DEMAND FOR JURY TRIAL

contamination. Defendant's control over the manufacturing, design, distribution, and safety testing of the Products provides it with exclusive knowledge of the presence of the material danger that using the Products in the way Defendant promises is safe leads to the direct ingestion of toxic microplastics. This superior knowledge imposed a responsibility on Defendant to disclose the risk of microplastic exposure. Instead, Defendant concealed this critical information while affirmatively marketing the Products with the affirmative "Microwavable" representations.

166. As a direct and proximate result of Defendant's breach of warranty, Plaintiffs and members of the Class were harmed in the amount of the purchase price they paid for the Products. Additionally, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages, including but not limited to the amounts paid for the Products and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for breach of warranty in the form of damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for these losses. Plaintiffs also seek injunctive relief to enjoin Defendant's misconduct and prevent ongoing and future harm to consumers.

167. Plaintiffs seek punitive damages pursuant to this cause of action for breach of warranty on behalf of Plaintiffs and the Class. Defendant's unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent behavior warranting an award of punitive damages as permitted by law. Defendant's misconduct was malicious in that Defendant acted with the intent to cause Plaintiffs and consumers to pay for Products that were not, in fact, what they believed they were purchasing. Defendant willfully and knowingly disregarded the rights of Plaintiffs and consumers, despite being fully aware of the probable dangerous consequences of its conduct. Rather than disclosing the risk that its Products leach harmful microplastics when

COMPLAINT AND DEMAND FOR JURY TRIAL

heated, Defendant deliberately concealed this information and continued marketing the Products with the affirmative "Microwavable" misrepresentations to intentionally mislead consumers. Defendant's misconduct was oppressive because its conduct was vile, base, and contemptible, the kind of behavior that reasonable people would look down upon and despise. By knowingly placing consumers at risk of microplastic exposure while falsely representing the Products as safe, Defendant subjected Plaintiffs and consumers to cruel and unjust hardship in knowing disregard of their rights. Defendant's misconduct was fraudulent because Defendant intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiffs and consumers. Defendant's wrongful conduct, demonstrating malice, oppression, and/or fraud, was committed, authorized, adopted, approved, and/or ratified by Defendant's officers, directors, and/or managing agents. Accordingly, Plaintiffs seek an award of punitive damages against Defendant to deter such egregious misconduct and to hold Defendant accountable for its intentional and reckless actions.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and those similarly situated, respectfully request that the Court enter judgment against Defendant as follows:

a.      Certification of the proposed Class, including appointment of Plaintiff's counsel as class counsel;

b.      An order declaring the Defendant's conduct violates the statutes and laws referenced herein;

c.      An order finding in favor of Plaintiff and the Class on all counts asserted herein;

d.      An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

COMPLAINT AND DEMAND FOR JURY TRIAL

e.      An order requiring Defendant to immediately cease and desist from selling its misbranded Products in violation of law; enjoining Defendant from continuing to label, market, advertise, distribute, and sell the Products in the unlawful manner described herein; and order Defendant to engage in corrective action;

f.      An award of compensatory damages in an amount to be determined at trial;

g.      An award of statutory damages in an amount to be determined at trial;

h.      An award of punitive damages in an amount to be determined at trial;

i.      An award of treble damages;

j.      An award of restitution in an amount to be determined at trial;

k.      An order requiring Defendant to undertake a corrective advertising campaign;

l.      An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

m.      For injunctive relief as pleaded or as the Court may deem proper;

n.      For reasonable attorney's fees and the costs of suit incurred; and

o.      For such further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury of all claims in this action.


Dated:  April 10, 2026                          Respectfully submitted,

                                                JAMES MORRIS LAW FIRM P.C.


                                                __/s/ James A. Morris, Jr._____
                                                James A. Morris, Jr., Esq.
                                                Shane Greenberg, Esq.

COMPLAINT AND DEMAND FOR JURY TRIAL

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, James A. Morris, declare as follows:

1.     I am counsel for Plaintiff, and I am the owner of James Morris Law Firm, P.C.. I make this declaration to the best of my knowledge, information, and belief of the facts stated herein.

2.     The complaint filed in this action is filed in the proper place for trial because the Defendant has done and is doing business in the County of Marin. Such business includes the marketing, distributing, and sale of Campbell's Soup Products at various retail stores.

3.     Plaintiff purchased her Campbell's Soup Products in the State of California for delivery to an address in Marin County.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct, executed on April 10, 2026, at Burbank, California.


　　/s/ James A. Morris, Jr.　　　　　　　
　　　　James A. Morris, Jr., Esq.

COMPLAINT AND DEMAND FOR JURY TRIAL